UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
PRINCESS REBECCA WILLIAMS,       :   05 Civ. 7503 (JCF)
                                 :
            Plaintiff,           :   MEMORANDUM
                                 :   AND    ORDER
      - against -                :
                                 :
JO ANNE B. BARNHART,             :
Commissioner of Social Security, :
                                 :
            Defendant.           :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

        The plaintiff, Princess Rebecca Williams, brings this action

pursuant to section 205(g) of the Social Security Act (the "Act"),

42 U.S.C. § 405(g), seeking review of a determination of the

Commissioner of Social Security (the "Commissioner") that she is

not disabled and therefore not entitled to Supplemental Security

Income ("SSI") benefits.  The parties have consented to proceed

before me for all purposes pursuant to 28 U.S.C. § 636(c), and they

have submitted cross-motions for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure.  For the

reasons that follow, the plaintiff's motion is granted, the

Commissioner's motion is denied, and the case is remanded to the

Social Security Administration (the "SSA" or the "agency") for

further proceedings.

Background

    A. Medical History

        The plaintiff was born on August 29, 1964; she completed four

1

months of nursing assistant training in 1985, and worked as a private duty nursing assistant until 1992. (Tr. at 29, 38, 43, 55).[1] She has not worked since. (Tr. at 38). Ms. Williams tested positive for human immunodeficiency virus ("HIV") on October 28, 2002 and received HIV counseling and follow-up care at Columbia Presbyterian Center, New York-Presbyterian Hospital ("Columbia-Presbyterian"). (Tr. at 101-02). Lab results on November 18, 2002 showed that Ms. Williams's CD4 count was 540 and her viral load was 1,153. (Tr. at 128).

The plaintiff saw Dr. David Ferris at Columbia-Presbyterian on November 27, 2002. (Tr. at 101). At that time, she stated that she had a history of severe and chronic back pain related to scoliosis.[2] (Tr. at 101). She reported that she experienced a burning sensation in her fingers and pain in her wrists, back, and knees. (Tr. at 101). However, she had "no acute complaints" at the time of the examination. (Tr. at 101). Ms. Williams reported that she had taken Naprosyn,[3] vitamin C, and multivitamin injections in the past. (Tr. at 101).

---

[1] "Tr." refers to the administrative record filed by the Commissioner together with the Answer.

[2] Scoliosis is "an appreciable lateral deviation in the normally straight vertical line of the spine." Dorland's Illustrated Medical Dictionary ("Dorland's") 1109-10 (29th ed. 2000).

[3] The active ingredient in Naprosyn is naproxen, a non-steroid anti-inflammatory agent used to treat osteoarthritis and rheumatoid arthritis. Dorland's 1177.

In undated notes that appear to be from the plaintiff's next visit,[4] Dr. Ferris noted the plaintiff's past substance abuse. (Tr. at 113, 172). Ms. Williams stated that she had used crack "years ago," and had also used marijuana, PCP, and cocaine. (Tr. at 113, 172). Dr. Ferris noted that her HIV infection was asymptomatic. (Tr. at 113, 172). He prescribed Clotrimazole, an antifungal cream. (Tr. at 172).

Ms. Williams next saw Dr. Ferris on January 29, 2003. (Tr. at 111, 171). He noted her history of chronic back pain, a pinched nerve in her left wrist, and osteoarthritis[5] in her left knee. (Tr. at 111, 171). Her "peeling skin" had improved with the Clotrimazole. (Tr. at 111, 171). She had no new complaints but continued to complain of back pain and a burning sensation in her fingers. (Tr. at 111, 171). Dr. Ferris prescribed Vioxx for her back pain, as well as multivitamin injections. (Tr. at 171, 156). He noted that Ms. Williams was currently drinking and using marijuana and cocaine, and he indicated the need for Ms. Williams to pursue drug treatment. (Tr. at 111, 156). Finally, Dr. Ferris noted that Ms. Williams's CD4 count had increased, and that her viral load had decreased. (Tr. at 111, 171).

On April 28, 2003, Ms. Williams was examined by Dr. Rhonald

---

[4] The notes refer to Ms. Williams' most November 18 lab results, and to a lab appointment on December 18. (Tr. at 113, 172).

[5] Osteoarthritis is a noninflammatory degenerative joint disease. Dorland's 1286.

Hyndman, a consultative physician with H.S. Systems, at the request of the New York State Department of Social Services.  (Tr. at 90-93).  Ms. Williams complained of pain in her back, hands, knees, and wrists.  (Tr. at 92).  Dr. Hyndman noted that the plaintiff took Naprosyn on a daily basis.  Upon examination, he diagnosed her with a skin rash (possibly eczema), joint pain, and mild anemia.  (Tr. at 93).  He noted that she tested positive for cocaine despite stating that she did not use illicit drugs.  (Tr. at 92-93, 95).  Dr. Hyndman found that Ms. Williams was able to engage in light to moderate work activity.  (Tr. at 93).  A "review team" concluded that Ms. Williams could do jobs involving light lifting and limited pulling, pushing, and bending, and less than four hours of standing or walking at a time.  (Tr. at 91).  They also found that she should avoid exposure to sun, cleaning solvents, and other irritants.  (Tr. at 91).

Ms. Williams next saw Dr. Ferris at Columbia-Presbyterian on June 18, 2003.  (Tr. at 110, 169).  At that visit, Ms. Williams stated that she was "sharing [one] bottle of sherry" twice per week.  (Tr. at 110, 169).  She reported that she was taking multivitamin injections, Vioxx, and Clotrimazole.  (Tr. at 110, 169).  Dr. Ferris gave her a  prescription for Naprosyn.  (Tr. at 110, 169).  Dr. Ferris noted that her last lab results indicated a CD 4 count of more than 500, and a viral load of approximately 1,000.  (Tr. at 110, 169).  Ms. Williams also reported ongoing back

4

pain, and Dr. Ferris referred her to a physical therapist for an evaluation. (Tr. at 110, 169).

Ms. Williams saw a social worker, Iris Gutierrez, on June 24, 2003. (Tr. at 136-38). Ms. Gutierrez noted that Ms. Williams had recently been evicted from her apartment and that the eviction had made it difficult for her to attend medical appointments. (Tr. at 138). She also noted that Ms. Williams denied drinking alcohol and avoided the topic. (Tr. at 138). Ms. Williams was "anxious and easily agitated," "guarded," and "unable to remain focused." (Tr. at 137).

On July 18, 2003, Ms. Williams saw a dermatologist at Columbia-Presbyterian, complaining of a burning, itching rash on her hands. (Tr. at 155). She was diagnosed with palmar keratoderma and suspected psoriasis, and the physician prescribed triamcinolone cream.[6] (Tr. at 155).

Ms. Williams saw a different physician, Dr. Karen Brodney, at Columbia-Presbyterian on September 18, 2003.[7] (Tr. at 153, 164). Ms. Williams complained of back pain, and the doctor noted that Ms.

---

[6] Palmar keratoderma is a disorder characterized by excessive formation of keratin on the palms of the hands and soles of the feet. Dorland's 939. Psioriasis is a common chronic dermatosis. Dorland's 939. Triamcinolone is used as an anti-inflammatory and immunosuppressant to treat a wide variety of disorders. Dorland's 1871.

[7] Ms. Gutierrez's notes from July 24, 2003 indicate that Dr. Ferris was Ms. Williams' primary physician. (Tr. at 138). Ms. Gutierrez also noted that Dr. Ferris would be away for six months, and that Ms. Williams would follow up with Dr. Brodney while he was away. (Tr. at 138).

Williams had never gone to physical therapy. (Tr. at 153, 164). Ms. Williams also complained that three days earlier she had developed weakness on the left side of her face that made it difficult to open her mouth. (Tr. at 153, 164). Dr. Brodney diagnosed Bell's palsy[8] and ordered an MRI along with HIV-related blood work. (Tr. at 153, 164). She also prescribed Valtrex.[9] (Tr. at 153, 164). Ms. Williams saw Dr. Brodney again on September 24, 2003, and Dr. Brodney found that the Bell's palsy was resolving. (Tr. at 151). She continued Ms. Williams on Valtrex and scheduled an MRI scan and additional blood work. (Tr. at 151).

Ms. Williams did not visit Columbia-Presbyterian again until March 25, 2004, when she saw Dr. Ferris. (Tr. at 147, 161). Ms. Williams again complained of chronic back pain. (Tr. at 147, 161). Dr. Ferris listed her medications as Celebrex[10] and multivitamin injections. (Tr. at 147, 161). Ms. Williams's Bell palsy had resolved, but Dr. Ferris noted dark plaque on her fingers and prescribed triamcinolone cream. (Tr. at 147, 161). Ms. Williams's

---

[8] Bell's palsy is "unilateral facial paralysis of sudden onset, due to lesion of the facial nerve." Dorland's 1307.

[9] Valtrex is a preparation of valacyclovir hydrochloride, which is used as an antiviral agent in the treatment of herpes zoster. Dorland's 1928. Herpes zoster is caused by the same virus that causes chicken pox, and frequently occurs in persons infected with HIV. Samuels v. Barnhart, No. 01 Civ. 3661, 2003 WL 21108321, at *2 n.4 (S.D.N.Y. May 14, 2003).

[10] Celebrex is a preparation of celecoxib, a non-steroid anti-inflammatory drug used to treat osteoarthritis and rheumatoid arthritis. Dorland's 305.

CD 4 count had decreased to 450 and her viral load was 13,052.
(Tr. at 147, 161).  Ms. Williams admitted to occasionally using
crack and drinking alcohol and stated that she traveled frequently
between New Jersey and South Carolina, where her mother lived.
(Tr. at 147, 161).  As a result, Dr. Ferris noted that Ms. Williams
would likely have difficulty adhering to an antiviral medication
regimen should she require one in the future.  (Tr. at 147, 161).

Ms. Williams's next doctor's visit was on September 21, 2004.
(Tr. at 145-46, 159-60).  Dr. Brodney noted that her Bell's palsy
had completely resolved.  (R. at 146, 160).  Ms. Williams
complained of severe pain in her neck and back from scoliosis, as
well as intermittent psoriasis.  (Tr. at 146, 160).  She also
admitted that she drank on weekends and occasionally used cocaine.
(Tr. at 146, 160).  A nurse's notes indicate that Ms. Williams
stated that she was not depressed and denied any "psychosocial
issues." (Tr. at 145, 159).

On November 8, 2004, Ms. Williams met with Ms. Gutierrez, who
noted that the plaintiff was actively using cocaine and alcohol
twice a week and that she also smoked marijuana.  (Tr. at 132-35).
 Ms. Williams said that she did not see her drug use as a problem
and was not interested in stopping.  (Tr. at 133).  Ms. Williams
also indicated that she was not interested in seeing a psychiatrist
or receiving any mental health follow-up.  (Tr. at 135).

As of November 11, 2004, Ms. Williams's CD 4 count was 288 and

her viral load was 45,125.  (Tr. at 125).  Ms. Williams saw Dr. Brodney again on November 23, 2004.  (Tr. at 143).  Dr. Brodney noted that Ms. Williams was "very non-compliant with all her appointments for unclear reason[s]."  (Tr. at 143).  Ms. Williams complained of painful scoliosis and denied any HIV-related opportunistic infections.  (Tr. at 143).  Dr. Brodney diagnosed Ms. Williams with obesity and depression.  (Tr. at 143).

B. Prior Proceedings

Ms. Williams applied for SSI on July 1, 2003.  (Tr. at 29-31). The plaintiff claimed that she was disabled as a result of scoliosis, osteoarthritis in her left knee, a pinched nerve in her left wrist, and psoriasis in both hands.  (Tr. at 37).  She stated that these conditions caused a constant burning sensation in her hands, and that her wrist, knee, and lower back hurt all the time. (Tr. at 37).

The plaintiff's application was denied on August 20, 2003. (Tr. at 24).  The denial was based on the medical records provided by Columbia-Presbyterian and Dr. Hyndman's report, because Ms. Williams failed to attend appointments with consultative physicians scheduled by the SSA.  (Tr. at 16, 24, 114).  SSA records indicate that unsuccessful attempts to contact Dr. Ferris were made on July 10 and July 31, 2003.[11]  (Tr. at 115).

The plaintiff requested a hearing before an Administrative Law

---

[11] Ms. Williams indicated on her application that Dr. Ferris was her treating physician.  (Tr. at 49).

Judge ("ALJ"), which was held on December 14, 2004. (Tr. at 175-184). Ms. Williams appeared pro se. (Tr. at 177). The hearing lasted thirteen minutes, and the transcript is less than ten pages long. (Tr. at 175-84).

Ms. Williams testified that she suffered no physical symptoms as a result of being HIV positive, although it sometimes caused her to become depressed. (Tr. at 181). She also indicated that she saw her social worker for depression. (Tr. at 180). She testified that she saw a doctor at Columbia-Presbyterian every six weeks. (Tr. at 179). Her Bell's palsy was "gone," but she suffered from pain in her legs, wrists, ribs, and back. (Tr. at 178-79). She also stated that she had psoriasis in both hands that caused them to "burn sometimes." (Tr. at 179). She indicated that medication did not always help the pain and that she did not sleep well as a result. (Tr. at 179).

Ms. Williams testified that she was able to stand for five minutes, sit for about ten minutes, walk approximately two blocks before needing rest, and lift one to two pounds. (Tr. at 180, 182). Ms. Williams stated that she did not cook or shop for groceries very often, but kept her room clean, read, and watched television. (Tr. at 182-83).

When questioned about her drug use, Ms. Williams indicated that she stopped using drugs when she got Bell's palsy. (Tr. at 179). The ALJ pointed out Ms. Gutierrez's notes from a month

earlier, which indicated that Ms. Williams was actively using cocaine and alcohol twice a week, and that she also smoked marijuana.  (Tr. at 181).  The plaintiff responded that she no longer smoked marijuana and that Ms. Gutierrez's notes were not accurate, but she did not address her cocaine and alcohol use. (Tr. at 181).

In an opinion issued on January 19, 2005, the ALJ found that Ms. Williams was not disabled under the Act.  (Tr. at 15-20).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council refused the plaintiff's request for review on June 7, 2005.  (Tr. at 3-5).  Ms. Williams filed this action on August 24, 2005.

<u>Discussion</u>

A. <u>Standard of Review</u>

Review of a social security disability determination involves two levels of inquiry.  First, the court reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard.  <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d. Cir. 1998).  Second, the court must determine whether the Commissioner's decision was supported by substantial evidence.  <u>Tejada</u>, 167 F.3d at 773; <u>Balsamo</u>, 142 F.3d at 79.  Substantial evidence in this context is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"   Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229 (1938)).  In this review, it is important to keep in mind that the Act "'is a remedial statute which must be liberally applied.'"  Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990) (quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)); accord Pagan ex rel. Pagan v. Chater, 923 F. Supp. 547, 550 (S.D.N.Y. 1996).

    B. Determining Disability

A claimant is disabled under the Act and therefore entitled to benefits if he can demonstrate that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 404.1520; Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).  First, the claimant must demonstrate that he is not

11

currently engaged in a substantial gainful activity.   20 C.F.R. §
404.1520(b).   Next, the claimant must prove that he has a severe
impairment which "significantly limits [his] physical or mental
ability to do basic work activities."   20 C.F.R. § 404.1520(c).
Third, if the impairment is listed in 20 C.F.R. § 404, Subpt. P,
App. 1 or is the substantial equivalent of a listed impairment, the
claimant is automatically considered disabled.   20 C.F.R. §
404.1520(d).   However, if the claimant's impairment is neither
listed nor equal to any listed impairment, he must prove that he
does not have the residual functional capacity to perform his past
work.   20 C.F.R. § 404.1520(e).

Finally, if the claimant satisfies his burden of proof on the
first four steps, the burden shifts to the Commissioner to show
that there is alternative substantial gainful employment in the
national economy that the claimant can perform.   20 C.F.R. §
404.1520(g); Shaw v. Chater, 221 F.3d 126, 131-32 (2d Cir. 2000).

> In the ordinary case, the Commissioner meets his burden
> at the fifth step by resorting to the applicable medical-
> vocational guidelines (the grids), 20 C.F.R. Pt. 404,
> Subpt. P, App. 2 [].   The grids take into account the
> claimant's residual functional capacity in conjunction
> with the claimant's age, education, and work experience.
> Based on these considerations, the grids indicate whether
> the claimant can engage in any substantial gainful work
> existing in the national economy.   Although the grid
> results are generally dispositive, exclusive reliance on
> the grids is inappropriate where the guidelines fail to
> describe the full extent of a claimant's physical
> limitations.   In particular, sole reliance on the grids
> may be precluded where the claimant's exertional
> limitations are compounded by significant nonexertional
> impairments that limit the range of sedentary work that

the claimant can perform.

Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (internal citations and quotation marks omitted).  "If application of the [g]rids is not appropriate, the ALJ must engage a vocational expert to testify as to the claimant's capacity to secure employment." Cangelosi v. Chater, No. 94 Civ. 2694, 1996 WL 663161, at *4 (E.D.N.Y. Nov. 5, 1996) (citing 20 C.F.R. § 404, Subpt. P, App. 2, Rule 200.00(e)(2)); see Samuels, 2003 WL 21108321, at *11 (citing Bapp v. Bowen, 802 F.2d 601, 606 (2d Cir. 1986)).

Exertional limitations are those that "'affect only [claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling).'" Santiago v. Massanari, No. 00 Civ. 3847, 2001 WL 1946240, at *7 n.9 (S.D.N.Y. July 16, 2001) (quoting 20 C.F.R. §§ 404.1569a(b) and 404.969a(b)).  "A nonexertional limitation is one that affects the claimant's 'ability to meet the demands of jobs other than the strength demands.'"  Id. (quoting 20 C.F.R. §§ 404.1569a(c) and 404.969a(c)).  Nonexertional limitations include "nervousness, anxiety, depression, difficulty maintaining attention or concentrating, and difficulty tolerating dust or fumes." Burgos v. Barnhart, No. 01 Civ. 10032, 2003 WL 21983808, at *18 (S.D.N.Y. Aug. 20, 2003) (citing 20 C.F.R. § 416.969a(c)(1)).

C. The ALJ's Determination

The ALJ found that Ms. Williams's impairments, including

13

scoliosis, substance abuse, HIV infection, and hand dermatitis, were severe but did not meet or equal the requirements for any impairment listed in 20 C.F.R. § 404, Subpt. P, App. 1.  (Tr. at 17).  He determined that the plaintiff's past work as a nurse's aide and home attendant was unskilled labor and involved "medium to heavy" exertion.  (Tr. at 16).

Based upon Dr. Hyndman's report, the ALJ found that Ms. Williams retained the residual functional capacity to perform "a range of light work activity" and had no significant nonexertional limitations.  (Tr. at 18-19).  The ALJ noted the consultative report from April 2003, which found that Ms. Williams should not perform work that involved "extended exposure to the sun, or exposure to cleaning solvents or other [skin] irritants."  (Tr. at 18).  The ALJ also found that Ms. Williams would be unable to perform work that involved "significant exposure to abusable substances" or a  "significant possibility of blood to blood contact."  (Tr. at 18).  Accordingly, the ALJ determined that Ms. Williams could no longer perform her past relevant work as a nurse's aide and home attendant.  (Tr. at 19).

However, the ALJ found that because she retained "the exertional capacity to physically perform substantially all of the requirements of light work and [had] no substantial nonexertional limitations, and considering [her] young age, superior education, and unskilled past relevant work experience," the Medical-

Vocational Guidelines dictated a finding that Ms. Williams was not disabled.  (Tr. at 19).

    D. <u>Duty to Develop the Record</u>

It is well-settled that in light of the "'essentially non-adversarial nature of a benefits proceeding,'" ALJs have an affirmative duty to develop the record. <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996) (quoting <u>Echevarria v. Secretary of Health and Human Services</u>, 685 F.2d 751, 755 (2d Cir. 1982)); <u>see also Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996).  Although "[t]his duty exists even when the claimant is represented," <u>Perez</u>, 77 F.3d at 47, it "is enhanced when the plaintiff is not represented by counsel."[12] <u>Williams v. Callahan</u>, 30 F. Supp. 2d 588, 595 (E.D.N.Y. 1998); <u>accord</u> <u>Cruz v. Sullivan</u>, 912 F.2d 8, 11 (2d Cir. 1990); <u>Mejias v. Apfel</u>, No. 96 Civ. 9680, 1998 WL 651052, at *5 (S.D.N.Y. Sept. 23, 1998).

The ALJ's duty to develop the record is particularly important "in light of the well-established treating physician rule, which requires an ALJ to grant significant weight to the opinions of []

---

[12] Ms. Williams also contends that the ALJ failed to give her adequate notice of her right to counsel.  It is not necessary to reach this issue because the action must be remanded for other reasons regardless of whether Ms. Williams was aware of her right to counsel.  <u>See</u> <u>Samuels</u>, 2003 WL 21108321, at *14 n.15.  Ms. Williams is now represented by an attorney and presumably aware of her right to representation on remand.

treating physicians."[13] <u>Valoy v. Barnhart</u>, No. 02 Civ. 8955, 2004 WL 439424, at *7 (S.D.N.Y. March 9, 2004); <u>accord</u> <u>Jones v. Apfel</u>, 66 F. Supp. 2d 518, 538 (S.D.N.Y. 1999).  In order to ensure that the medical record is complete, "an ALJ must do more than merely request a <u>pro</u> <u>se</u> plaintiff's medical records for the period during which disability benefits are sought."  <u>Almonte v. Apfel</u>, No. 96 Civ. 1119, 1998 WL 150996, at *7 (S.D.N.Y. 1998); <u>see also</u> <u>Connor v. Barnhart</u>, No. 02 Civ. 2156, 2003 WL 21976404, at *5 (S.D.N.Y. Aug, 18, 2003) ("'[R]aw data' or even complete medical records are insufficient by themselves to fulfill the ALJ's duty." (citations omitted)).  Rather, the ALJ must also make "every reasonable effort to obtain . . . a report that sets forth the opinion of that treating physician as to the existence, the nature and the severity of the claimed disability."[14] <u>Peed v. Sullivan</u>, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991); <u>accord</u> <u>Suriel v. Commissioner of Social Security</u>, No. CV-05-1218, 2006 WL 2516429, at *6 (E.D.N.Y. Aug, 29, 2006); <u>Dimitriadis v. Barnhart</u>, No. 02 Civ. 9203, 2004 WL 540493,

---

[13] A treating physician's opinion is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence.  <u>Clark v. Commissioner of Social Security</u>, 143 F.3d 115, 118 (2d Cir. 1998)(citing 20 C.F.R. § 404.1527(d)(2)); <u>accord</u> <u>Schisler v. Sullivan</u>, 3 F.3d 563, 567 (2d Cir. 1993).

[14] In order to ensure that the record is complete, an ALJ is authorized to issue subpoenas requiring the production of any evidence relating to a matter under his or her consideration.  <u>See</u> 42 U.S.C. § 405(d); 20 C.F.R. § 404.950(d)(1); <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998) ((noting that "plain language" of regulation places decision to issue subpoena within ALJ's discretion).

at *9 (S.D.N.Y. March 17, 2004); Valoy, 2004 WL 439424, at *7;
Peralta v. Callahan, No. 97 Civ. 5174, 1999 WL 294722, at *5 (March
24, 1999); Vaughn v. Apfel, 98 Civ. 0025, 1998 WL 856106, at *7
(S.D.N.Y. Dec. 10, 1998); Soler v. Chater, No. 93 Civ. 2935, 1995
WL 520020, at *3 (S.D.N.Y. Aug. 16, 1995).

"'Reasonable efforts' in this context entails more than merely
twice requesting reports from treating physicians; it includes
issuing and enforcing subpoenas requiring the production of
evidence, and advising the plaintiff of the importance of the
evidence." Suriel, 2006 WL 2516429, at *4 (citing Jones, 66 F.
Supp. 2d at 524); see also Almonte, 1998 WL 150996, at *7 (holding
that "an ALJ must do more than merely request a pro se plaintiff's
medical records" and suggesting that the ALJ "could have pursued"
a subpoena). "'Until he satisfies this threshold requirement, the
ALJ cannot even begin to discharge his duties to the pro se
claimant under the treating physician rule.'" Encarnacion v.
Barnhart, No. 00 Civ. 6597, 2003 WL 1344903, at *3 (S.D.N.Y. March
19, 2003) (quoting Almonte, 1998 WL 150996, at *7). Furthermore,
the ALJ must enter into the record his attempts to develop the
medical evidence. Suriel, 2006 WL 2516429, at *4; Jones, 66 F.
Supp. 2d at 524.

SSA regulations state that after making "every reasonable
effort" to help the claimant obtain records from her treating
physicians, the ALJ may assess the claimant's residual functional

17

capacity based upon the available record.   See 20 C.F.R. §
416.945(a)(3).  The Commissioner points out that the regulations
define "every reasonable effort" as one initial and one follow-up
request for a medical report.  20 C.F.R. § 416.912(d)(1).  However,
compliance with the minimum requirements of the regulations is not
always sufficient to satisfy the ALJ's heightened duty to develop
the record where the claimant is unrepresented.  See Suriel, 2006
WL 2516429, at *6 (finding two subpoenas requesting "all medical
records" to treating physician insufficient to satisfy ALJ's
heightened duty); Brown v. Barnhart, No. 02 Civ. 4523, 2003 WL
1888727, at *8 (S.D.N.Y. April 15, 2003) (remanding where ALJ
failed to seek more detailed report from treating physician before
rejecting his opinion regarding plaintiff's ability to work);
Vaughn, 1998 WL 856106, at *7 (remanding where ALJ twice requested
medical records from treating physician but failed to request
physician's opinion regarding plaintiff's disability); Mejias, 1998
WL 651052, at *6 (remanding where New York State Office of
Disability Determinations made two attempts, one at ALJ's request,
to contract treating physician).

     As noted above, the record indicates that the agency made two
attempts to contact Dr. Ferris and that Dr. Ferris did not respond.
(Tr. at 115).  The record does not indicate what information was
requested.  More than a year and a half passed between the agency's
attempts to contact Dr. Ferris in July 2003 and the hearing in

December 2004, and the plaintiff's medical records indicate that the plaintiff continued to see Dr. Ferris regularly during that time.   At the hearing, the ALJ noted that he had medical records from Columbia-Presbyterian, but did not mention that the record contained no opinion from the plaintiff's treating physician regarding her ability to perform work-related activities.  (Tr. at 177).  The ALJ did not inform the plaintiff that she could seek such an opinion herself.  Nor did he make any effort to contact Dr. Ferris or Dr. Brodney[15] to request that they provide an opinion regarding the plaintiff's disability, despite the fact that the plaintiff provided Dr. Ferris's beeper number in her application. (Tr. at 40, 72).

In his decision, the ALJ noted that Ms. Williams testified regarding "physical pain, including her back, left leg, left heel, and wrist," but did not otherwise address Ms. Williams's complaints of chronic pain.  (Tr. at 16).  He stated that "this case has a noticeable absence of supporting statements from treating sources" because the Columbia-Presbyterian records showed "primarily monitoring for her still asymptomatic HIV disease."  (Tr. at 18). The ALJ failed to note numerous references to the plaintiff's back pain and other symptoms in treatment notes from Dr. Ferris and Dr.

---

[15] Although the plaintiff indicated in her application that Dr. Ferris was her treating physician, the record contains treatment notes from both physicians spanning the duration of Ms. Williams's treatment at Columbia-Presbyterian.   Furthermore, the social worker's notes indicate that Dr. Brodney treated Ms. Williams when Dr. Ferris was away.  (Tr. at 138).

Brodney, as well as evidence that she was prescribed drugs to treat these symptoms.  In light of this record, the ALJ should have sought the opinion of Ms. Williams's treating physicians regarding the nature and severity of her non-HIV-related symptoms.

The ALJ also disregarded Ms. Williams's testimony regarding her functional limitations and appears to have relied solely upon the report of Dr. Hyndman, who had examined the plaintiff over a year and a half earlier at the request of the New York State Department of Social Services.  (Tr. at 18).  However, a report from "'a consulting physician who examined the plaintiff once does not constitute 'substantial evidence' upon the record as a whole . . . .'" Peed, 778 F. Supp. at 1246 (quoting Hancock v. Secretary of Health, Education, and Welfare, 603 F.2d 739, 740 (8th Cir. 1979)).  Rather than rely solely upon Dr. Hyndman's consultative report, the ALJ was obligated to make reasonable efforts to obtain an opinion from Ms. Williams' treating physician regarding her residual functional capacity.

When the record before the ALJ is incomplete or inadequate, an ALJ's failure to request the opinion of a pro se claimant's treating physician is grounds for remand.[16] See, e.g., Valoy, 2004

---

[16] The ALJ's duty to seek an opinion from the plaintiff's treating physician is not excused by the plaintiff's failure to attend scheduled consultative examinations.  See Soler, 1995 WL 520020, at *3 ("While the Court recognizes the difficulty of adjudicating the claims of an uncooperative claimant and does not condone [the plaintiff's] recalcitrance, an ALJ must not ignore established principles in denying benefits to such a claimant.").

WL 439424, at *7-8 (remanding where ALJ subpoenaed medical records but "failed to request that the treating physicians submit reports on [plaintiff's] asserted disability and in particular, their perspective as to her fitness for employment"); Soler, 1995 WL 520020, at *3 ("Once the ALJ became aware that the medical record sent by [the treating physician] did not contain any diagnosis as to [plaintiff's] alleged disability, he should have made appropriate arrangements to have [the treating physician] submit an additional report containing such information.").   At the very least, the ALJ should have informed Ms. Williams that the record lacked any opinion from her treating physician regarding her residual functional capacity, that she could obtain such an opinion by her own devices, and that she could subpoena his testimony if necessary.   See Cruz, 912 F.2d at 12 (remanding because ALJ "failed to advise [the plaintiff], a pro se claimant, that he should obtain a more detailed statement from [his treating physician]"); Jones, 66 F. Supp. 2d at 539-40 (remanding where ALJ failed to subpoena medical records, explain why records were necessary, or inform plaintiff that she could subpoena treating physicians' testimony); Mejias, 1998 WL 651052, at *6 (remanding where ALJ failed to subpoena treating physician or "inform [the] plaintiff that she should -- or even could -- produce additional evidence or call her treating physicians as witnesses"); Almonte, 1998 WL 150996, at *7 ("Possible avenues the ALJ could have pursued included a subpoena,

enforcement of the subpoena, and advice to the plaintiff of the importance of the evidence."); Rodriguez v. Apfel, No. 96 Civ. 1132, 1997 WL 691428, at *6 (S.D.N.Y. Nov. 4, 1997) ("At the very least, the ALJ should have informed [the plaintiff] of his right to subpoena and cross-examine witnesses."); Carroll v. Secretary of Department of Health and Human Services, 872 F. Supp. 1200, 1204-05 (S.D.N.Y. 1995) (remanding where ALJ subpoenaed treating physician's records but failed to enforce subpoena or inform plaintiff that she could obtain records independently or call physician to testify).

Because of the ALJ's failure to develop the record before making a determination regarding Ms. Williams's residual functional capacity, the action must be remanded in order to obtain the opinion of Ms. Williams's treating physician regarding her ability to perform work-related activities.

E. Nonexertional Limitations

As explained above, the ALJ concluded that although Ms. Williams could not perform her past relevant work, the Medical-Vocational Guidelines required him to find that she was not disabled. Ms. Williams, however, contends that there is evidence in the record that she suffers from depression. According to the plaintiff, her depression constitutes a significant nonexertional limitation that make exclusive reliance upon the grids

inappropriate.[17]

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the grids. Bapp, 802 F.2d at 603. However,

> when a claimant's nonexertional impairments significantly diminish his ability to work -- over and above any incapacity caused solely [by] exertional limitations -- so that he is unable to perform the full range of employment indicated by the [grids], then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.

Id.; see also Pratts, 94 F.3d at 38-39. A claimant's ability to work is significantly diminished if there is an "additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp, 802 F.2d at 606; accord Pratts, 94 F.3d at 39.

The ALJ did not mention Ms. Williams's depression in his decision, although there are references to it in the record. For instance, on November 8, 2004, Ms. Gutierrez, the plaintiff's social worker, noted that Ms. Williams denied any psychiatric

---

[17] Ms. Williams also claims that her chronic pain constitutes a nonexertional limitation. However, the plaintiff appears to consider her pain an exertional limitation, noting that "[a]s a result of her pain, [she] testified that she could only stand for about five minutes, sit for about ten minutes, walk about two blocks, and lift one or two pounds." (Memorandum of Law in Support of Plaintiff's Motion For Judgment on the Pleadings ("Pl. Memo."), at 13). Whether Ms. Williams's pain should be considered a nonexertional or an exertional limitation may be clarified upon remand by an opinion from Ms. Williams's treating physician.

history "but seems dual diagnosed" with substance abuse and mental health issues. (Tr. at 134). Dr. Brodney also diagnosed the plaintiff with depression on November 23, 2004. (Tr. at 143). Furthermore, the plaintiff testified at the hearing that she suffered from depression, and met with her social worker "once a week" to address it. (Tr. at 180-81). In response to Ms. Williams's testimony, the ALJ asked only whether Ms. Williams's social worker was "helpful," and whether her depression caused any physical symptoms. (Tr. at 180-81). Ms. Williams told him that she had no physical symptoms of depression at the moment, and started to say something further, but the ALJ interrupted her with a question about her drug use. (Tr. at 181).

Where there is some evidence of a nonexertional limitation, but insufficient evidence to make a determination regarding whether it significantly diminishes a pro se claimant's ability to work, the ALJ has an affirmative duty to develop the record. Samuels, 2003 WL 21108321, at *12. In this case, despite his duty to "'explore the nature and extent of [the claimant's] subjective symptoms,'" Brown, 2003 WL 1888727, at *9 (quoting Selmo v. Barnhart, No. 01 Civ. 7374, 2002 WL 31445020, at *8 (S.D.N.Y. Oct. 31, 2002)) (alteration in original), the ALJ conducted only a cursory examination of the plaintiff regarding her depression. See id. at 10 (noting that "[r]ather than probing [] the circumstances of [a seizure mentioned by claimant] . . . the ALJ proceeded to question [the claimant] about his possible alcoholism").

24

Furthermore, as noted above, the ALJ did not seek the opinion of Ms. Williams's treating physician.

Accordingly, the ALJ erred in failing to develop the record sufficiently to determine whether Ms. Williams's depression is a significant nonexertional limitation.[18] Upon remand, the ALJ should determine whether the plaintiff's nonexertional limitations significantly diminish her ability to work and, if necessary, obtain the testimony of a vocational expert or other evidence regarding the existence of jobs in the national economy for an individual with Ms. Williams's limitations. See Pratts, 94 F.3d at 39 (remanding where ALJ found some evidence of nonexertional limitations but failed to consider whether testimony of vocational expert was needed in light of those limitations); Cangelosi v. Chater, No. 94 Civ. 2694, 1996 WL 663161, at *6 (S.D.N.Y. Nov. 5, 1996) (remanding where ALJ failed to "refer to any evidence in the record to support his finding [that plaintiff's depression had "minimal effect" on her ability to work] or to undertake a separate

---

[18] The Commissioner cites Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998), for the proposition that where there is little in the record to suggest mental impairment, the ALJ owes no duty to develop the record any further. (Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings, at 8). In that case, however, there was affirmative evidence in the record that the plaintiff did not suffer from a mental disorder. Treatment notes indicated that the claimant's psychiatric symptoms were under "adequate control," and the claimant's own treating physician opined that the claimant's physical condition did not manifest in nervousness, depression, or anxiety. Id. In this case, by contrast, there was no indication in the record that Ms. Williams's depression had resolved. Indeed, Dr. Brodney diagnosed her with depression only a month prior to the hearing.

independent analysis to determine the effect, if any, of [plaintiff's] nonexertional limitations").

    F. Credibility

    Finally, Ms. Williams claims that the ALJ failed to properly evaluate her credibility.   To resolve whether a claimant is disabled, the ALJ must  consider statements made by the claimant about symptoms, such as pain, and about how the symptoms affect daily living and the ability to work.  20 C.F.R. § 404.1529(a). "Statements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged." Davis v. Massanari, No. 00 Civ. 4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001) (citing 42 U.S.C. § 423(d)(5)(A) and 20 C.F.R. § 404.1529(a)).  In order to assess the scope of any functional limitations resulting from a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the claimant's symptoms, including pain, "considering the claimant's credibility in light of 'all of the available evidence.'" Davis, 2001 WL 1524495, at *6 (quoting 20 C.F.R. § 416.929(c)(1)).

    A reviewing court must defer to an ALJ's finding regarding a claimant's credibility when it is supported by substantial evidence. Osorio v. Barnhart, No. 04 Civ. 7515, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006) (citing Aponte v. Secretary of Health

and Human Services, 728 F.2d 588, 591 (2d Cir. 1984)).  If an ALJ
finds that a claimant is not credible, he must set forth the
reasons for that finding "with sufficient specificity to permit
intelligible plenary review of the record." Williams v. Bowen, 859
F.2d 255, 260-61 (2d Cir. 1998) (citing Carroll v. Secretary of
Health and Human Services, 705 F.2d 638, 643 (2d Cir. 1983)).  A
determination of credibility will "be set aside if it is not set
forth with 'sufficient specificity to enable [a reviewing court] to
decide whether [it] is supported by substantial evidence.'"
Osorio, 2006 WL 1464193, at *6 (quoting Ferraris v. Heckler, 728
F.2d 582, 587 (2d Cir. 1984)) (alterations in original).

    As noted above, the ALJ dismissed Ms. Williams's complaints of
chronic pain in her back, wrists, left heel, and ribs.  He did so
based upon the "absence of supporting statements from treating
sources." (Tr. at 18).  The ALJ provided no other explanation for
his finding that Ms. Williams's allegations were "not totally
credible," but his credibility finding appears to be based in part
upon the fact that "[c]onfronted with [a] medical record indicating
continued alcohol and drug abuse, the claimant continued with her
denial." (Tr. at 16, 19).  However, it is unnecessary to address
the plaintiff's contention that the ALJ's credibility finding was
not supported by substantial evidence because, as explained above,
a remand is necessary for other reasons.  The ALJ will have the
opportunity to reassess Ms. William's credibility in light of a
more complete record.

Conclusion

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied, the plaintiff's motion is granted, and the case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Clerk of Court is respectfully requested to enter judgment accordingly and close the case.

SO ORDERED.

*James C. Francis IV*

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          March 27, 2007

Copies mailed this date:

Charles E. Binder, Esq.
Binder & Binder, P.C.
215 Park Avenue South, 6th Floor
New York, New York 10003

Leslie Ramirez-Fisher, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

28